1

2

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

3

United States of America,

4

Plaintiff

5 v.

6 Omar Ortiz Negrete,

7

Defendant

Case No.: 2:24-cr-00103-JAD-DJA-2

**Order Denying Defendant's Motion to Dismiss**

[ECF No. 27]

8        Defendant Omar Ortiz Negrete has been indicted on one count of illegally possessing a

9 firearm as an immigrant unlawfully present in the United States under 18 U.S.C. § 922(g)(5)(A).

10 He contends that the statute is unconstitutional under the United States Supreme Court's new

11 test for laws that implicate the Second Amendment right to bear arms that was articulated in *New*

12 *York Rifle & Pistol Ass'n v. Bruen*.[1]  He also challenges the law under the Fifth Amendment's

13 equal-protection component, arguing that it impermissibly targets him based on his exercise of a

14 fundamental constitutional right and his membership in a suspect class.

15        Both of Ortiz's challenges fail.  Assuming that the Second Amendment extends to

16 undocumented immigrants and Ortiz's conduct, I find that founding-era laws disarming

17 individuals who refused to swear allegiance to the United States are relevantly similar to

18 § 922(g)(5)(A), showing that the statute "is consistent with the Nation's historical tradition," and

19 thus that it "falls outside the Second Amendment's unqualified command."[2]  And because

20 § 922(g)(5)(A) is rationally related to a legitimate government interest, Ortiz's equal-protection

21 challenge fails.  So I deny his motion to dismiss.

22

23 [1] *N.Y. Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

[2] *Id.* at 17 (cleaned up).

**Discussion**

**A.    Second Amendment challenges must be analyzed under *Bruen*'s two-step framework.**

The Second Amendment states that "a well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[3] In *New York Rifle and Pistol Ass'n v. Bruen*, the Supreme Court articulated a new framework to determine whether a government regulation violates the Second Amendment.[4]  Courts must first determine whether "the Second Amendment's plain text covers" the regulated conduct.[5]  If it does, "the government must then justify its regulation by demonstrating that it is consistent with the nation's historical tradition of firearm regulation."[6]  The first question requires "a textual analysis focused on the normal and ordinary meaning of the Second Amendment's language."[7] The second demands a historical assessment in which a court looks to the historical record to determine how the Second Amendment was interpreted around the time of ratification up through the 19th century.[8]  This historical inquiry involves "reasoning by analogy": "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'"[9]  And the court

---

[3] U.S. Const. amend. II.

[4] *Bruen*, 597 U.S. at 24.

[5] *Id.*

[6] *Id.* (cleaned up).

[7] *Id.* at 20 (cleaned up) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 576–77 (2008)).

[8] *Id.* at 20–21 (cleaned up).

[9] *Id.* at 28–29 (quoting Cass R. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)).

1 need not "engage in searching historical surveys" to conduct this analysis, it is "entitled to decide

2 [the] case based on the historical record compiled by the parties."[10]

3

4  **_1._**        **_The court assumes without deciding that the Second Amendment covers Ortiz and his conduct._**

5        18 U.S.C. § 922(g)(5)(A) makes it "unlawful for any person who, being an alien, is

6 illegally or unlawfully in the United States, . . . to . . . possess . . . any firearm or

7 ammunition . . . ."[11]  Ortiz argues that possessing a firearm is obviously conduct covered by the

8 Second Amendment.[12]  He also insists that he is part of "the people" whom the Second

9 Amendment protects.[13]  The government disagrees on both counts.  It contends that Ortiz was

10 indicted for possessing "illegal" unregistered firearms, and that owning illegal firearms is not

11 conduct protected by the Second Amendment.[14]  It also argues that *Bruen*'s focus on the

12 application of the Second Amendment to "law-abiding citizens" suggests that undocumented

13 immigrants are not protected, as they are neither law-abiding nor citizens.[15]

14        **_a._**        **_Though it's likely that Ortiz's ownership of unregistered guns falls outside of the Second Amendment's scope, this court assumes that his conduct is covered for the purposes of resolving this motion._**

15

16        The government asserts that the guns that Ortiz possessed—a short-barreled shotgun, a

17 short-barreled AR-type rifle with a silencer, and an unserialized pistol—do not fall within the

18 Second Amendment's scope.[16]  It theorizes that the short-barreled guns and silencer were not

19 _____

[10] *Id.* at 25 n.6 (cleaned up).

20 [11] 18 U.S.C. § 922(g)(5)(A).

21 [12] ECF No. 27 at 7.

[13] *Id.*

22 [14] ECF No. 28 at 3.

23 [15] *Id.* at 3–4.

[16] ECF No. 28 at 3.

registered as required by the National Firearms Act (NFA), and because ownership of those

unregistered guns is unlawful, Ortiz's possession of them "certainly does not fall within *Bruen*'s

protection of law-abiding citizens' right to possess firearms."[17]

The government may be right that some of the weapons that Ortiz is charged with

possessing fall outside of the Second Amendment's ambit.  The Supreme Court has held that

short-barreled shotguns, for example, are not protected,[18] and that holding was affirmed by

*Bruen* and the court's other landmark Second Amendment decision, *District of Columbia v.*

*Heller*.  The *Heller* court remarked that "the Second Amendment does not protect those weapons

not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled

shotguns," noting that such limitations are "fairly supported by the historical tradition of

prohibiting the carrying of 'dangerous and unusual weapons.'"[19]  *Bruen* did not disturb that

general holding, noting that "the Second Amendment protects only the carrying of weapons that

are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at

large.'"[20]

But the government has not sufficiently shown that the same treatment should be

extended to the other weapons for which Ortiz is indicted.  Courts have interpreted *Heller* and

*Bruen*'s commentary on restrictions for certain weapons to require an analysis of whether a

regulated weapon is "commonly lawfully used" to determine if the Second Amendment protects

---

[17] *Id.* (quotation omitted).

[18] *United States v. Miller*, 307 U.S. 174, 178 (1989).

[19] *Heller*, 554 U.S. at 625, 627.

[20] *Bruen*, 597 at 47 (quoting *Heller*, 554 U.S. at 627).

1 ownership of that weapon.[21]  The government provides no information about these other

2 weapons other than that some of them were not registered under the NFA, nor does it supply any

3 binding authority suggesting that owning an unregistered gun is always unprotected conduct or

4 that these guns in particular should be excluded because they are dangerous or unusual.  I'm not

5 convinced that failure to register is enough to categorically exclude Ortiz's conduct from the

6 scope of the Second Amendment under *Bruen*.  And though I could hazard a guess that an

7 unserialized pistol and a short-barreled AR-type rifle with a silencer don't fall under the

8 "commonly lawful" umbrella, I decline to reach that conclusion in the absence of robust

9 argument by the government.  So for the purposes of this motion, I assume without deciding that

10 Ortiz's conduct falls under the Second Amendment's protection.

11

12            ***b.       The court also assumes without deciding that the Second Amendment
            protects the rights of undocumented immigrants.***

13        The government insists that Ortiz is not part of "the people" to whom Second

14 Amendment protections extend because he is not lawfully present in this country.  It argues that

15 the Supreme Court has limited the right to bear arms to "law-abiding citizens" and points to three

16 other circuits that have so held—some before *Bruen*, one after.[22]  The government also

17

18 [21] *See United States v. Price*, 111 F.4th 392, 408 (4th Cir. 2024) (holding that firearms with
obliterated serial numbers "fall outside of the scope of the Second Amendment's protection"
19 because they were not "commonly lawfully used").

20 [22] *See United States v. Sitladeen*, 64 F.4th 978, 985–87 (8th Cir. 2023) (reaffirming prior
conclusion that undocumented immigrants aren't covered by the Second Amendment, finding
that *Bruen*'s reasoning did not disturb the basis of that holding); *United States v. Carpio-Leon*,
21 701 F.3d 974, 979 (4th Cir. 2012) (holding that "illegal aliens do not belong to the class of law-
abiding members of the political community to whom the Second Amendment gives protection,"
22 relying on historical evidence of the scope of the right); *United States v. Portillo-Munoz*, 643
F.3d 437, 440 (5th Cir. 2011) (relying on *Heller*'s use of the phrases "law-abiding, responsible
23 citizens" and "members of the political community" to conclude that undocumented immigrants
are not afforded Second Amendment protections).  *But see United States v. Meza-Rodriguez*, 798
F.3d 664, 669 (7th Cir. 2015) (holding that the Second Amendment does extend to

1  acknowledges that the Ninth Circuit expressly declined to answer this question in 2019 in *United*

2  *States v. Torres*,[23] but suggests that *Torres* is "no longer viable after *Bruen*."[24]

3        In *Torres*, the Ninth Circuit considered a Second Amendment challenge to

4  § 922(g)(5)(A), the very same statute that Ortiz is now charged under.[25]  It first grappled with the

5  exact issue presented here: whether an immigrant unlawfully present in the United States was

6  part of "the people" who enjoy the constitutional right to keep and bear arms.  It pointed to the

7  Supreme Court's decision in *United States Verdugo-Urquidez*,[26] which defined "the people" as

8  used in the First, Second, Fourth, Ninth, and Tenth Amendments as "refer[ing] to a class of

9  persons who are part of a national community or who have otherwise developed sufficient

10 connection with this country to be considered part of that community."[27]  The panel then

11 considered *Heller*'s consistent use of the terms "citizens," "Americans," and "law-abiding" when

12 describing the Second Amendment right.[28]

13       The *Torres* court found that it could not follow the lead of other circuits holding that

14 *Heller* compels the conclusion that undocumented immigrants are categorically excluded from

15 "the people."[29]  It noted that the *Heller* court was not tasked with precisely defining "the

16 people"—it was instead focused on whether the right to bear arms is an individual or a collective

17 undocumented immigrants and noting that, while *Heller* commonly used language implying a
18 citizenship requirement when discussing the scope of right to bear arms, "those passages did not reflect an attempt to define the term 'people'").

19 [23] *United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019), *abrogated in part by Bruen*, 597 U.S. 1.

20 [24] ECF No. 28 at 4.

21 [25] *Torres*, 911 F.3d at 1256.

[26] *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990).

22 [27] *Id.* at 265 (citation omitted).

23 [28] *Torres*, 911 F.3d at 1259.

[29] *Id.* at 1261.

one, and concluded that the amendment is meant to protect an individual's rights.[30]  While *Heller*

explained the contours of that right with language of citizenry, it did not hold that "the people"

was so limited.  So the *Torres* panel concluded that "the state of the law precludes [the Ninth

Circuit] from reaching a definite answer on whether unlawful aliens are included in the scope of

the Second Amendment right," assumed without deciding that they are, and moved on to the

(now-invalid) scrutiny analysis.[31]

The government's assertion that *Bruen* somehow mitigates the reservations discussed by

the Ninth Circuit in *Torres* is unconvincing.  Like in *Heller*, the Court in *Bruen* did not set out to

define "the people."  It merely noted, using language similar to that employed in dicta in *Heller*,

that it was "undisputed that [the] petitioners[]—two ordinary, law-abiding, adult citizens—are

part of 'the people' whom the Second Amendment protects."[32]  It made no effort to further

explore who may not be part of "the people," because that issue was not before the Court.  While

the government relies on the fact that *Bruen* continued *Heller*'s trend of referring to "law-abiding

citizens" to assert that they are the only subset of individuals to whom the Second Amendment

applies, such logic was rejected as not dispositive in *Torres*, and one more Supreme Court

opinion repeating the same language, without more, does not appear to change that calculus.  So,

I follow *Torres*'s undisturbed holding and, because this assumption does not alter my conclusion

that § 922(g)(5)(A) withstands Second Amendment scrutiny, I assume for the purposes of this

order that Ortiz is among the class of individuals protected by the Second Amendment.

---

[30] *Id.*

[31] *Id.*

[32] *Bruen*, 597 U.S. at 31–32.

1

**2.    *Founding-era laws requiring oaths of allegiance as a prerequisite to gun
ownership are a sufficiently relevant historical analogue to § 922(g)(5).***

2

3        Ortiz contends that there is no historical precedent for criminalizing the ownership of

4 firearms for undocumented immigrants.[33]  He points out that § 922(g)(5)(A) "was created only in

5 1968, much too recently for Second Amendment purposes, and its historical basis can be

6 reasonably traced back as far as the [unsuccessful] Capper Bill of 1922."[34]  And he highlights the

7 fact that "even the concept of documentation status" for immigrants "post-dates any relevant

8 period of time under *Bruen*," remarking that "[t]he idea of illegal immigrants is of late 19th

9 century vintage."[35]

10       But *Bruen* does not require the court to locate an exact founding-era replica of a

11 challenged statute to find that the charging statute is consistent with historical traditions

12 concerning gun ownership.  "[A]nalogical reasoning requires only that the government identify a

13 well-established and representative historical *analogue*, not a historical *twin.*  So even if a

14 modern-day regulation is not a dead ringer for historical precursors, it still may be analogous

15 enough to pass constitutional muster."[36]  The Supreme Court recognized that statutes

16 "implicating unprecedented societal concerns" or "new circumstances" may still satisfy the

17 Second Amendment as long as there was a "relevantly similar" regulation that existed during the

18 founding era.[37]

19 _____

[33] ECF No. 27 at 8–9.

20 [34] *Id.* at 9.

21 [35] *Id.* (citing *Plyler v. Doe*, 457 U.S. 202, 205 (1982) (explaining that federal immigration
restrictions began "in the late 19th century")).

22 [36] *Bruen*, 597 U.S. at 30.

23 [37] *Id.* at 30.  Ortiz suggests that the "purported risk from immigrants accessing guns" has "existed
since the 18th century" and thus that § 922(g)(5)(A) "addresses a general societal problem that
has persisted" since the founding.  ECF No. 27 at 8.  Under Ortiz's interpretation of *Bruen*,

8

1    The government has met its burden to show that a sufficiently analogous historical

2 regulation exists, and thus that § 922(g)(5)(A) is consistent with the Second Amendment.  It

3 points to "the [f]ounding-era prohibition on gun possession for anyone refusing to swear an oath

4 of loyalty."[38]  After the Declaration of Independence was signed, and following the lead of

5 colonial-era governments that prohibited persons "unwilling to affirm his allegiance to the

6 British Crown from collecting firearms,"[39] several states "passed laws providing for the

7 confiscation of weapons owned by persons refusing to swear an oath of allegiance to the state or

8 the United States."[40]  In 1776, Massachusetts passed a law requiring that men over 16 years old

9 "subscribe to a test of allegiance" and disarmed "such [p]ersons as are notoriously disaffected to

10 the [c]ause of America, or who refuse to associate to defend by [a]rms the United American

11 Colonies."[41]  Maryland and North Carolina enacted laws requiring tests of allegiance and barred

12 those who refused to swear their loyalty to their states from keeping arms.[42]  Virginia and

13

14 because the statute addresses a founding-era problem, the government must show that a
"distinctly similar" historical regulation exists from that time period, rather than a "relevantly

15 similar" one.  *See* ECF No. 27 at 8 (quoting *Bruen*, 597 at 26).  But Ortiz goes on to say that
Congress didn't start treating the presence of undocumented immigrants as a societal problem

16 requiring legislation until the late 19th century.  *Id.* at 9 (noting that "[i]t was not even a crime to
be undocumented until 1929").  So it wouldn't make much sense to conclude that the societal

17 concerns motivating § 922(g)(5)(A) existed since the founding.  Given Ortiz's own insistence
that concerns about immigration status cropped up post-founding, I analyze § 922(g)(5)(A) under

18 the "relevantly similar" standard.

19 [38] ECF No. 28 at 5.

20 [39] *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047–48 (11th Cir. 2022) (quoting Adam
Winkler, *Gun Fight: The Battle Over the Right to Bear Arms in America* 116 (2011)).

21 [40] *United States v. Bernabe-Martinez*, 2024 WL 778114, at \*5 (D. Idaho Feb. 26, 2024) (quoting
Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun
Control*, 73 Fordham L. Rev. 487, 506 (2004)).

22 [41] *A Well Regulated Right*, 73 Fordham L. Rev. 487, 507 (quoting Act of Mar. 14, 1776, ch. VII,
1775–76 Mass. Acts 31–32 (1776)).

23 [42] Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early
America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 160 (2007)

1  Pennsylvania also enacted laws in 1777 that "disarmed" any white male who did not swear

2  allegiance and fidelity to their states.[43]  Adding to the list, "Rhode Island, New Jersey, and even

3  the Continental Congress also prohibited possession of firearms by those who 'refused to declare

4  an oath of loyalty' during the Revolutionary War era."[44]  "These laws reveal 'an early feature of

5  the emerging republic'—the selective 'disarmament of groups associated with foreign

6  elements.'"[45]

7       Several district courts within the Ninth Circuit and across the country have held that this

8  historical tradition of banning persons unwilling to swear an oath of allegiance from possessing

9  guns is analogous to § 922(g)(5)(A)'s criminalization of gun ownership by undocumented

10  immigrants, and I am persuaded by their reasoning.[46]  Those historical analogs and

11

12  (citing An Act for the Better Security of the Government, ch. XX, Md. Laws (1777); An Act to
   Prevent and Suppress Insurrections, Md. Laws (1778); An Act to Raise Two Battalions of Militia
   for Reinforcing the Continental Arm, Md. Session Laws (1781); An Act for Directing the
13  Method of Appointing Jurors, N.C. Session Laws (1777)).

14  [43] Act of June 13, 1777, § 1 (1777), in 9 The Statutes at Large of Pennsylvania from 1652–1801
   110, 111–13 (William Stanley Ray ed., 1903); An Act to Oblige the Free Male Inhabitants of this
15  State Above a Certain Age to Give Assurances of Allegiance to the Same, and for Other
   Purposes ch. III (1777), in 9 Statutes at Large: Being a Collection of All the Laws of Virginia,
16  From the First Session of the Legislature in the Year 1619, at 281 (William W. Hening ed.
   1821)).

17  [44] *United States v. Gil-Solano*, 699 F. Supp. 3d 1063, 1070 n.5 (D. Nev. 2023) (citing *United
   States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023), *vacated*, 2024 WL 3768055 (8th Cir. 2024)
18  (citing 4 *Journals of the Continental Congress*, 1774–1789, at 205 (Worthington Chauncey Ford
   ed., 1906); Act of June 1776, 7 *Records of the Colony of Rhode Island and Providence
19  Plantations in New England* 567 (1862); Act of Sept. 20, 1777, ch. XL, 1777 N.J. Laws 90))).

20  [45] *Jimenez-Shilon*, 34 F.4th at 1048 (holding pre-*Bruen* that § 922(g)(5)(A) "does not infringe the
   right that the Second Amendment embodies," reasoning that founding-era laws required
21  "undivided allegiance to the sovereign" as a "precondition to the right to keep and bear arms"
   (cleaned up)).

22  [46] *See, e.g.*, *Gil-Solano*, 699 F. Supp. 3d at 1070–72; *United States v. DeBorba*, 713 F. Supp. 3d
   1042, 1060 (W.D. Wash. 2024); *United States v. Vazquez-Ramirez*, 711 F. Supp. 3d 1249, 1259
23  (E.D. Wash. 2024); *United States v. Leveille*, 659 F. Supp. 3d 1279, 1284–85 (D.N.M. 2023);
   *United States v. Pineda-Guevera*, 685 F. Supp. 3d 380, 387 (S.D. Miss. 2023); *United States v.
   Bernabe-Martinez*, 2024 WL 778114, at *5–6 (D. Ida. Feb. 26, 2024); *United States v. Duque-*

§ 922(g)(5)(A) have similar scopes: they completely restrict access to guns.  And they were enacted for similar purposes: to restrict access to firearms by those who have not demonstrated allegiance to the United States.  Ortiz contends that this is too loose a fit, arguing that it's a leap to say that undocumented immigrants would refuse to swear an oath of allegiance; they just haven't been given a chance to do so.  He asserts that "the typical immigrant, legal or illegal, would swear any oath to the United States to be allowed to stay here, and many consider themselves to be Americans already."[47]

But "[f]or better or worse, immigration laws are the 'imperfect system the United States has set up as a proxy for national allegiance,'"[48] so is the method that the government has chosen to distinguish between those who enter this country with the intent to declare their loyalty to the United States and abide by its laws and those who lack that intent.  While the founding-era allegiance laws may not be identical to § 922(g)(5)(A), they are sufficiently analogous to show that the statute is "consistent with the principles that underpin our regulatory tradition" under the Second Amendment.[49]  I thus deny Ortiz's motion to dismiss on Second Amendment grounds.

---

*Ramirez*, 2024 WL 4508582, at *6–7 (W.D. Okla. Oct. 16, 2024); *United States v. Chavira-Ornelas*, 2024 WL 3875796, at *6 (D.N.M. Aug. 20, 2024); *United States v. De Los Santos-Santana*, 2024 WL 98556, at *4–5 (D.P.R. Jan. 8, 2024); *United States v. Escobar-Temal*, 2023 WL 4112762, at *5–6 (M.D. Tenn. June 21, 2023).  *But see United States v. Sing-Ledezma*, 706 F. Supp. 3d 650 (W.D. Tex. 2023) (holding that founding-era allegiance laws are not relevantly similar to § 922(g)(5)(A) and finding the statute facially unconstitutional under the Second Amendment).

[47] ECF No. 29 at 3.

[48] *Gil-Solano*, 699 F. Supp. 3d at 1072 (quoting *Leveille*, 659 F. Supp. 3d at 1284).

[49] *United States v. Rahimi*, 602 U.S. __, 144 S. Ct. 1889, 1898 (2024).

1

2

**B.      Section 922(g)(5)(A) doesn't violate the Fifth Amendment's equal-protection guarantee.**

3      Ortiz next contends that § 922(g)(5)(A) violates the equal-protection principles inherent

4  in the Fifth Amendment's due-process clause.  While the Fifth Amendment, unlike the

5  Fourteenth Amendment, "contains no equal-protection clause and . . . provides no guaranty

6  against discriminatory legislation by Congress,"[50] the Supreme Court has held that "the liberty

7  protected by the Fifth Amendment's due[-]process clause contains within it the prohibition

8  against denying to any person the equal protection of the laws."[51]  So "equal[-]protection

9  analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."[52]

10      The Fifth Amendment's equal-protection guarantee requires "that all persons similarly

11  situated should be treated alike."[53]  If a classification drawn by a statute "disadvantages a

12  'suspect class' or impinges a 'fundamental right,' the [statute] is subject to strict scrutiny."[54]  But

13  if the classification does neither, then the government must "assert only a rational basis" for its

14  classification.[55]  Ortiz asserts that strict scrutiny applies because § 922(g)(5)(A) unequally

15  deprives him of the fundamental right to keep and bear arms, discriminates against him based on

16  his alienage, and improperly uses immigration status as a proxy for race.  The government

17  responds that rational-basis review is the appropriate standard here.

18

---

19  [50] *Detroit Bank v. United States*, 317 U.S. 329, 337 (1943).

20  [51] *United States v. Windsor*, 570 U.S. 744, 774 (2013) (first citing *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954); then citing *Adarand Constructors, Inc. v. Penã*, 515 U.S. 200, 217–18 (1995)) (cleaned up).

21  [52] *Buckley v. Valeo*, 424 U.S. 1, 93 (1976).

22  [53] *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

23  [54] *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997) (quoting *Plyler*, 457 U.S. at 216–17).

[55] *Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991).

1

2

### 1. *Ortiz's fundamental-right argument is subsumed by the Second Amendment analysis and requires no further consideration under the Fifth Amendment.*

Ortiz contends that, because § 922(g)(5)(A) concerns the fundamental right to bear arms guaranteed by the Second Amendment, strict scrutiny applies to this Fifth Amendment inquiry.[56] But that argument has been considered and rejected by the Ninth Circuit. In *Teixeira v. County of Alameda*, a circuit panel explained that "because the right to bear arms for self-defense is not only a fundamental right, but an enumerated one, it is more appropriately analyzed under the Second Amendment than" the Fourteenth Amendment's equal-protection clause.[57] And in *Pena v. Lindley*, the plaintiffs argued that a law regulating the sale of "unsafe handguns" violated their Second Amendment and equal-protection rights.[58] The appellate panel found that, "[t]o the extent that the [e]qual [p]rotection challenge is based on the Second Amendment's fundamental right to bear arms and the disparate treatment of groups exercising that right . . . that challenge is subsumed in the Second Amendment inquiry . . . ."[59] So I do not apply strict scrutiny based on Ortiz's assertion that § 922(g)(5)(A) deprives him of his fundamental right to keep and bear arms. That challenge is better confined to the Second Amendment inquiry discussed *supra*.

---

[56] ECF No. 27 at 10.

[57] *Teixeira v. Cnty. of Alameda*, 833 F.3d 1047, 1052 (9th Cir. 2016), *aff'd in part and rev'd in part on reh'g en banc*, 873 F.3d 670, 676 n. 7 (9th Cir. 2017) (noting that the appellant "did not seek rehearing of the panel's rejection of his [e]qual[-][p]rotection claim[]" and affirming "the district court on that claim for the reasons given in the panel opinion").

[58] *Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018).

[59] *Id.* at 986 (citing *McDonald v. City of Chicago*, 561 U.S. 742 (2010)).

1

2

    **2.**       *Ortiz has not shown that immigration status is so closely connected with race that his challenge necessitates strict-scrutiny analysis.*

3

4

5

6

7

8

    Ortiz next urges that strict scrutiny applies because § 922(g)(5)(A) "uses documentation status as a proxy for race."[60]  He contends that disarming immigrants has historically reflected racially discriminatory motives and the 1968 law that § 992(g)(5)(A) "arose from" was motivated by "notions of danger to the white population from racial minorities in the civil rights movement."[61]  The government responds that Ortiz's generalized links to immigration policy and racial animus are insufficient to show that the statute is a proxy for a race-based classification.[62]

9

10

11

12

13

14

15

16

17

18

    Proxy discrimination "arises when the [government] enacts a law or policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group."[63]  Ortiz's argument instantly fails because he doesn't identify the racially disfavored group that he believes is being targeted by § 922(g)(5)(A) specifically, or by immigration policy more generally.  Section 922(g)(5)(A) applies to all undocumented immigrants regardless of their race or national origin.  Immigrant demographics shift constantly in this country—there is no indication that laws governing undocumented immigrants were meant to single out any particular racial group.  And Ortiz presents no evidence or argument suggesting that § 922(g)(5)(A) targets specific groups within the immigrant

19

20

---

21

[60] ECF No. 27 at 13–14.

22

[61] *Id.* at 12–13 (quoting Pratheepan Gulasekaram, *"The People" of the Second Amendment: Citizenship and the Right to Bear Arms*, 85 N.Y.U. L. Rev. 1521, 1562 (2010)).

[62] ECF No. 28 at 10–11.

23

[63] *Davis v. Guam*, 932 F.3d 822, 837 (9th Cir. 2019) (quoting *McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992)).

1   community based on seemingly neutral criteria closely associated with a disfavored group.  So I

2   cannot conclude that strict scrutiny applies based on Ortiz's discrimination-by-proxy argument.

3

> **3.      *Federal immigration policies are analyzed under the rational-basis standard
4      and, under that standard, Ortiz's equal-protection challenge fails.***

5         Finally, Ortiz contends that heightened scrutiny applies because "[a]lienage

6   classifications generally get strict scrutiny," relying on authority evaluating *state* laws that treat

7   immigrants differently than citizens based on their immigration status.[64]  But the Supreme Court

8   has recognized that heightened review isn't warranted when the *federal* government enacts laws

9   that rely on alienage classifications.  In *Mathews v. Diaz*, the High Court acknowledged that it

10  had previously struck down a state law denying welfare benefits to resident aliens, finding that

11  the law violated the equal-protection clause of the Fourteenth Amendment.[65]  But, the court

12  reasoned, different considerations came into play when evaluating a similar federal law denying

13  some immigrants the ability to participate in federal medical insurance programs.[66]  The

14  *Mathews* court concluded that part of the job of the federal government is to control border

15  access and create immigration classifications as "a routine and normally legitimate part of its

16  business."[67]

17

18

---

19  [64] ECF No. 27 at 11 (first citing *Graham v. Richardson*, 403 U.S. 365, 372 (1971) (applying
    strict scrutiny to a state's welfare program that denied benefits based on immigration status,
20  reasoning in part that the federal government, and not the state, has exclusive control over setting
    immigration policy); then citing *Smith v. South Dakota*, 781 F. Supp. 2d 879, 884 (D.S.D. 2011)
21  (analyzing state-law gun-permit restrictions under strict scrutiny); then citing *Fotoudis v. Cnty. of
    Honolulu*, 54 F. Supp. 3d 1136, 1141–43 (D. Haw. 2014) (same)).

22  [65] *Mathews v. Diaz*, 426 U.S. 67, 84 (1976) (citing *Graham*, 403 U.S. 365).

23  [66] *Id.* at 84–86.

    [67] *Id.* at 85.

1    The Ninth Circuit has consistently interpreted *Mathews* to suggest that "[f]ederal

2 classifications based on alienage receive rational basis review."[68]  And though Ortiz doesn't

3 categorize it this way, § 922(g)(5)(A) isn't so much an alienage classification as a classification

4 based on a person's status as an *undocumented* immigrant.  The Supreme Court has explicitly

5 held that "[u]ndocumented [immigrants] cannot be treated as a suspect class because their

6 presence in this country in violation of federal law is not a constitutional irrelevancy."[69]  So,

7 because Ortiz hasn't shown that he belongs to a suspect class and the immigration classification

8 at issue is created by federal law, I apply rational-basis review here.  Under that standard, the

9 classification need only be "rationally related to a legitimate government interest," and "the

10 burden falls on the party seeking to disprove the rationality of the relationship between the

11 classification and the purpose."[70]

12    The government contends that the Ninth Circuit has already determined that

13 § 922(g)(5)(A) satisfies an even higher standard of review than the rational-basis test required

14 here.[71]  In *Torres*, the court undertook an intermediate-scrutiny analysis of the law under the

15 now-defunct Second Amendment test that asked "whether the challenged law burdens conduct

16 protected by the Second Amendment and . . . if so," directed courts to apply the appropriate

17 heightened scrutiny to the law.[72]  Though *Torres* is no longer good law from a Second

18

---

19 [68] *United States v. Ayala-Bello*, 995 F.3d 710, 715 (9th Cir. 2021) (citing *Sudomir v. McMahon*, 767 F.2d 1456, 1464 (9th Cir. 1985)).

20 [69] *Plyler*, 457 U.S. at 223 (cleaned up) (applying rational-basis test to state law prohibiting reimbursement to school districts for their education of undocumented children).

21 [70] *United States v. Navarro*, 800 F.3d 1104, 1113 (9th Cir. 2015) (quoting *City of Cleburne*, 473
22 U.S. at 440) (cleaned up).

[71] ECF No. 28 at 9–10.

23 [72] *Torres*, 911 F.3d at 1258 (quoting *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013), *abrogated by Bruen*, 597 U.S. 1).

1  Amendment standpoint, its intermediate-scrutiny analysis is instructive for this equal-protection

2  inquiry.

3       The panel in *Torres* concluded that the government had important interests in "crime

4  control and public safety" that are "promoted by keeping firearms out of the hands of unlawful

5  aliens—who are subject to removal, are difficult to monitor due to an inherent incentive to falsify

6  information and evade law enforcement, and have already shown they are unable or unwilling to

7  conform their conduct to the laws of this country."[73]  Those same interests qualify as legitimate

8  under the less-stringent rational-basis review.  And a law criminalizing gun ownership for

9  undocumented immigrants because of the unique relationship with law enforcement that group

10  tends to have (i.e., one of evasion, not of compliance) is rationally related to the interest of

11  keeping the public and law-enforcement officers safe.  So I find that § 922(g)(5)(A) survives

12  rational-basis review, and Ortiz's equal-protection challenge fails.

13                              **Conclusion**

14       IT IS THEREFORE ORDERED that Omar Ortiz Negrete's motion to dismiss **[ECF No.**

15  **27] is DENIED**.

16                                              _____
                                                U.S. District Judge Jennifer A. Dorsey
17                                                          October 30, 2024

18

19

20

21

22

23

---

[73] *Id.* at 1263–64; *see also* ECF No. 28 at 9–10 (relying on *Torres*'s findings to argue that § 922(g)(5)(A) satisfies the rational-basis test).

17